## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **YONGQIAN MO,**<br><br>  **Plaintiff,**<br><br>      v.<br><br>**UNITED STATES CITIZENSHIP &**<br>**IMMIGRATION SERVICES,** *et al.*,<br><br>  **Defendants.** | **Civil Action No. 22-1342 (JEB)** |

## <u>MEMORANDUM OPINION</u>

Through a program known as EB-5, United States Citizenship and Immigration Services issues immigration visas to eligible non-citizens who invest capital in a new commercial enterprise in the United States that creates at least 10 full-time positions for qualifying employees. As a threshold requirement of the program, foreign investors seeking EB-5 visas must demonstrate that their invested capital derives from lawful means. Having carefully reviewed hundreds of pages of submissions by Plaintiff Yongqian Mo, a Chinese national and EB-5 applicant, USCIS determined that he had failed to satisfy this burden and thus denied his immigration application. After multiple unsuccessful attempts to overturn the decision through administrative remedies, Mo filed suit in this Court under the Administrative Procedure Act, alleging that the agency's denial was arbitrary, capricious, and not supported by substantial evidence. The parties now cross-move for summary judgment. Because the Court concludes that the agency's decision was reasonable and supported by the record, it will grant Defendants' Motion.

## I.    Background

A.  <u>Statutory Background</u>

The Immigration and Nationality Act provides EB-5 "'employment creation' visas to prospective immigrants seeking to engage in a new commercial enterprise [NCE] in the United States." <u>Huashan Zhang v. USCIS</u>, 978 F.3d 1314, 1316 (D.C. Cir. 2020) (citing 8 U.S.C. § 1153(b)(5)).  Pursuant to regulations implementing 8 U.S.C. § 1153(b)(5), a foreign investor seeking an EB-5 visa must provide evidence that she "has invested or is actively in the process of investing lawfully obtained capital in a[n] [NCE] in the United States" that will create at least ten full-time positions for qualifying United States workers.  <u>See</u> 8 C.F.R. § 204.6(j).  As in most administrative immigration proceedings, the burden of proof in an adjudication of an EB-5 visa application rests with the petitioning investor, who must establish by a preponderance of evidence that she is fully qualified.  <u>See</u> 8 U.S.C. § 1361; 8 C.F.R. § 103.2(b)(1); <u>Matter of Chawathe</u>, 25 I. & N. Dec. 369, 375 (2010).  The preponderance-of-evidence standard requires that the evidence demonstrate that the applicant's claim is "'probably true,' where the determination of 'truth' is made based on the factual circumstances of each individual case." <u>Chawathe</u>, 25 I. & N. Dec. at 376.  When adjudicating an application pursuant to such a standard, the USCIS officer must "examine each piece of evidence for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true."  <u>Id.</u>

At issue here is the regulatory requirement under 8 C.F.R. § 204.6(j) that the EB-5 investor demonstrate the lawful source of her capital investment funds.  To make this showing, the investor must include with her I-526 petition relevant financial documents such as "[f]oreign-business[-]registration records," "[c]orporate . . . and personal tax returns . . . filed within five

years" of filing the petition, or any other "[e]vidence identifying any other source[] of [the investor's] capital." 8 C.F.R. § 204.6(j)(3)(i)–(iv). Additionally, courts in this district and others have repeatedly recognized that the investor must document the complete path of her funds. See Borushevskyi v. USCIS, 664 F. Supp. 3d 117, 128 (D.D.C. 2023) (holding that plain language of 8 C.F.R. § 204.6(j)(3) supports complete-path requirement); Sadeghzadeh v. USCIS, 322 F. Supp. 3d 12, 17–18 (D.D.C. 2018) (noting that "under governing regulations and precedent, an [EB-5] applicant must document the complete path of her investment funds"); Binbin Lei v. USCIS, 2017 WL 5957641, at *5 n.5 (C.D. Cal. Mar. 23, 2017) (distinguishing a petitioner's obligation to show "lawful source of her investment funds" from her separate obligation to show "complete path of her funds").

B. USCIS's Initial Decision

Mo and his wife Hong Zhu are both Chinese citizens. See ECF No. 33-1 (Pl. Certified Administrative Record App. 1) at 22 (Passport of Yongqian Mo), 355 (Passport of Hong Zhu). In January 2015, Mo made a $500,000 investment in a new commercial enterprise named Birch Boston Funds I, LP. See ECF No. 31-2 (Def. Certified Administrative Record Vol. 1) at 12 (Memorandum in Support of Plaintiff's I-526 Petition). He also remitted $45,000 to the NCE's general partner Birch Boston GP, LLC to cover fees and expenses. See ECF No. 31-3 (Def. Certified Administrative Record Vol. 2) at 1990 n.2 (AAO First Decision). He subsequently filed a Form I-526, Immigrant Petition by Alien Entrepreneur, with USCIS to seek an EB-5 visa based on that investment. See Pl. CAR App. 1 at 3–5 (Plaintiff's I-526 Petition). Mo claimed that the funds for this investment derived from a loan obtained from a Chinese bank, secured by four properties he and Zhu owned. See ECF No. 33-1 (Pl. Certified Administrative Record App. 2) at 49–52 (Explanation of Source of Funds).

On December 13, 2016, USCIS issued a Notice of Intent to Deny the Form I-526 petition, identifying several deficiencies and providing Mo an opportunity to address them. See Def. CAR Vol. 1 at 760–73 (Notice of Intent to Deny). The issues raised by USCIS include the source of funds that Mo and Zhu used to purchase the four properties, discrepancies in Zhu's reported employment history, and a restrictive clause contained in the bank-loan contract. Id. at 765–66. While Mo submitted a detailed response addressing issues raised by USCIS and supplied additional documentation, id. at 774–836 (Plaintiff's Response to Notice of Intent to Deny), USCIS found that the response failed to shore up the identified deficiencies and did not prove that the investment funds were obtained through lawful means. Id. at 837–44 (Notice of Decision on Plaintiff's I-526 Petition). It accordingly denied Mo's I-526 petition on April 4, 2017. Id. at 837.

C.  Motions to Reopen

Plaintiff subsequently submitted a Motion to Reopen and a combined Motion to Reopen and Reconsider, each accompanied by additional evidence on his and his wife's employment history and income certifications purporting to address the issues identified by USCIS in the initial decision and to prove the lawful source of the investment funds. See ECF Nos. 33-2 (Pl. CAR App. 5) at 849–964 (Plaintiff's Motion to Reopen); 33-3 & 33-4 (Pl. CAR App. 7) at 973–1470 (Plaintiff's First Combined Motion to Reopen and Reconsider). Both Motions were denied by USCIS, however, as it concluded that the new evidence provided did not solve all previously identified deficiencies. See ECF No. 33-2 (Pl. CAR App. 6) at 965–971 (Decision on Motion to Reopen); Def. CAR Vol. 1 at 1471–80 (Decision on First Combined Motion to Reopen and Reconsider).

On October 2, 2018, Mo appealed the matter to the USCIS Administrative Appeals Office (AAO).  See Def. CAR Vol. 1 at 1481–1485 (First Appeal to AAO).  The AAO, after reviewing the record *de novo*, also ruled against Mo and dismissed the appeal on July 12, 2019. See AAO First Decision at 1988–94.  The AAO based its decision on three reasons: first, Plaintiff did not adequately explain the source of certain funds he transferred to the NCE, see id. at 1990; second, he did not establish that the loan contract authorized him to use the bank loan to invest in the NCE, see id. at 1991; and third, even assuming Mo could lawfully use the loan proceeds to invest in the NCE, the record contained inconsistent evidence regarding Zhu's employment history and did not show that Mo and Zhu had possessed sufficient funds to purchase the four properties that served as collateral for the loan.  See id. at 1991–92.

Undeterred, Mo submitted a Second Combined Motion to Reopen and Reconsider to USCIS on August 7, 2019, providing even more evidence in response to the issues raised by the AAO.  See ECF No. 33-8 (Pl. Certified Administrative Record App. 11) at 1995–2217 (Plaintiff's Second Combined Motion to Reopen and Reconsider).  This Motion fared no better than his previous ones, as USCIS again denied it on February 19, 2020.  See ECF No. 33-9 (Pl. Certified Administrative Record App. 12) at 2218–27 (USCIS Decision on Second Combined Motion to Reopen and Reconsider).

D.  Lawsuit

On May 17, 2022, Mo filed the current suit in this Court.  See ECF No. 1 (Compl.).  On January 9, 2023, finding that the USCIS officer who had denied Plaintiff's Second Combined Motion lacked jurisdiction over it, the AAO reopened the matter on its own motion and gave Mo an opportunity to file a brief.  See ECF No. 33-9 (Pl. Certified Administrative Record App. 14) at 2240 (AAO Second Decision).  Two months later, after reviewing Mo's brief and the new

evidence accompanying the Second Combined Motion, the AAO denied it once again.  Id. at

2240–46.  Reiterating the three reasons given in its first decision, the AAO concluded that Mo's

filing and newly submitted evidence did not establish that its prior decision was wrong.  Id.

Plaintiff has since filed an Amended Complaint here, contending that the agency's denial

of his I-526 petition was arbitrary and capricious and was not supported by substantial evidence.

See ECF No. 22 (Am. Compl.), ¶¶ 58–66.  Cross-Motions for Summary Judgment are now ripe.

## II.    Legal Standard

Plaintiff relies on the Administrative Procedure Act, 5 U.S.C. § 701 et seq., to challenge

USCIS's denial of his visa application.  Summary judgment is one mechanism for adjudicating

claims under the APA.  See Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52

(D.D.C. 2010).  Given the limited role federal courts play in reviewing administrative decisions,

however, the typical Federal Rule 56 summary-judgment standard does not apply in such

cases.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006) (citing Nat'l

Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. Mar.

23, 2005)). Instead, "the function of the district court is to determine whether or not . . . the

evidence in the administrative record permitted the agency to make the decision it did."  Id.

(internal citations omitted).  Summary judgment thus serves as the mechanism for deciding, as a

matter of law, whether an agency action is supported by the administrative record and is

otherwise consistent with the APA standard of review.  See Bloch v. Powell, 227 F. Supp. 2d

25,31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

Pursuant to the APA, a court reviews agency decisions to determine if they are "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §

706(2)(A).  Under this "narrow" standard of review — which appropriately encourages courts to

defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) — an agency is required to "examine the

relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." Id. (internal quotation marks

omitted). Review by a court under the APA is generally limited to the administrative record that

was before the agency when it reached its decision. Voyageurs Nat'l Park Ass'n v. Norton, 381

F.3d 759, 766 (8th Cir. 2004). Although a court may not "supply a reasoned basis for the

agency's action that the agency itself has not given," it must "uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S.

at 43 (internal quotation marks and citation omitted). In other words, unless a court "can

conclude that no rational adjudicator would have come to the same conclusion," it must affirm

the agency's decision. Visinscaia v. Beers, 4 F. Supp. 3d 126, 133 (D.D.C. 2013).

## III.    Analysis

To prevail at summary judgment, Mo must establish that all three of the AAO's

independent bases for denying his application were arbitrary and capricious. See Pierce v. SEC,

786 F.3d 1027, 1034 (D.C. Cir. 2015) ("[A] reviewing court will uphold an agency action resting

on several independent grounds if any of those grounds validly supports the result.");

Sadeghzadeh, 322 F. Supp. 3d at 17 (citing Pierce and noting that AAO's decision denying

plaintiff's EB-5 application must be affirmed "[s]o long as the court is satisfied that one of the

AAO's reasons for denying Plaintiff's application is a sufficient and independent basis for its

decision"). As Mo does attempt to refute all three of AAO's bases, at least in his Reply brief, the

Court will address them *seriatim*.

A.  Source of Funds for NCE

In its first decision, the AAO pointed out that Mo had neglected to explain the nature of a portion of the funds he eventually remitted to the NCE.  See AAO First Decision at 1990.  In response, he presented additional bank statements, purporting to show that he had used an intermediary entity to facilitate the transfer of funds between two of his bank accounts, one ending in 5406 and the other in 1888.  See AAO Second Decision at 2242–43 (explaining additional bank statements submitted by Plaintiff).  The submitted bank statements show that on January 13, 2015: (1) Mo received in his account ending in 5406 $8,500 from an account he jointly owned with his wife Zhu and $36,500.37 from an unidentified account with a transaction statement of "Direct Family Funds Transfer"; (2) Mo remitted $45,000 to the intermediary entity; and (3) the intermediary entity made a transfer of $45,000 to Mo's account ending in 1888.  Id. at 2242.  Mo eventually remitted almost all funds in his account ending in 1888 to the NCE as his EB-5 investment and to the NCE's general partner to cover fees and expenses on January 16, 2015.  Id. at 2243.

Reviewing Plaintiff's new submission, the AAO noted that although the additional bank statements helped shed light on the path of the funds, he had not explained the source of the two deposits that his bank account ending in 5406 received on January 13, 2015.  Id. at 2243.  The AAO explained that because the $45,000 was eventually remitted to Mo's account ending in 1888 — and then to the NCE and its general partner — Plaintiff must document the source of those funds to ensure their legality.  Id.

For his part, Mo asserted that he "need not document the lawful source of all the funds" that flowed into his account ending in 1888 because the account balance had already exceeded the requisite $500,000 on January 9, 2015, and the deposits received afterwards — on January

8

13, 2015 — were "of no relevance" because they "did not form part of [his] EB-5 investments funds." Id.

The AAO maintained, however, that the record does not support this proposition. Id. While the funds in Mo's account ending in 1888 covered both his EB-5 investment and the fees and expenses to the NCE's general partner, Plaintiff "ha[d] not shown which deposits financed his purported EB-5 investment and which deposits financed his payment for fees and expenses." Id. As money is fungible, the AAO stated that Mo must "document the lawful source of all the funds in his account ending in 1888 received prior to January 16, 2015," the day on which he transferred the $500,000 EB-5 investment to the NCE. Id. Because he had failed to do so, the AAO again concluded that Mo had not sufficiently documented the complete path of his purported EB-5 investment. Id.

Mo here takes issue with this conclusion and argues that he has already proven by a preponderance of evidence the legality of the $500,000 he eventually used to invest in the NCE. See ECF No. 29 (Pl. Resp. to Def. Cross-Mot.) at 8. He further suggests that the AAO's "requirement that [he] prove the legal source of funds for deposits that were not even part of the EB-5 investment funds [was] clearly arbitrary and capricious." Id.

The Court disagrees. While the balance in Mo's account ending in 1888 already exceeded $500,000 on January 9, 2015 — and the AAO does not seem to dispute that he had proven the legality of the source of those funds — the two deposits in question ($8,500 and $36,500.37) were remitted to that account on January 13, prior to the transfer of the $500,000 investment to the NCE on January 16. Because money is fungible, Mo cannot simply claim, without any evidence, that the two deposits in question were not part of his EB-5 investment. See Matter of Ho, 22 I. & N. Dec. 206, 211 (1998) (noting that "simply going on record without

supporting documentary evidence is not sufficient for purposes of meeting the burden of proof"
in EB-5 application proceedings).  The AAO was well within its discretion to require that Mo
prove the legality of the source of funds for the $8,500 and $36,500.37 deposits he received and
eventually transmitted to the NCE.  As he never did so, the Court therefore finds the agency's
conclusion on this issue to be reasonable.

     B.  <u>Use of Bank Loan</u>

     Next up is the restrictive clause in the bank-loan contract.  The AAO stated in its first
decision that loan documents provided by Mo did not confirm that he was authorized to use the
proceeds of the loan to invest in the NCE.  <u>See</u> AAO First Decision at 1991.  The
"Comprehensive Credit Line Contract" Plaintiff provided contained a clause stating that the
3,200,000 RMB loan extended under the contract "shall be for the purpose of <u>operation
turnover</u>" and that the funds shall not be used "for adventure and equity investment in the aspect
of securities and futures."  <u>Id.</u>  The loan voucher similarly indicated that the "Loan Usage" is
"Operating Cycle."  <u>Id.</u>  Based on these explicit references,  the AAO concluded that the
evidence did not support Mo's position that he could lawfully use the proceeds for his personal
investment.  <u>Id.</u>

     In response, Plaintiff submitted a July 2019 statement purportedly from the bank that
issued the loan.  <u>See</u> Pl. CAR App. 11 at 2054–55 (Statement by China Minsheng Bank).  The
statement explained that Mo had obtained the loan "in order to raise funds for investment
immigration" and that "the provision regarding the usage of the loan did not violate any laws,
regulations, or the bank's internal administrative policy."  <u>Id.</u>  Mo also offered a legal opinion
from a Chinese attorney.  <u>Id.</u> at 2057–59 (Legal Opinion by Co-Effort Law Firm LLP).  Relying
on the July 2019 statement and citing Chinese law, the legal opinion stated that the bank was

"fully aware that the loan issued to [Mo] [w]as for immigration purpose[s]," and that "the restrict[ive] clause prohibiting loan purpose for equity investment"  should be deemed "changed under the consensual actions conducted by both parties."  Id. at 2058.

The AAO, however, questioned the veracity and accuracy of the July 2019 statement in its second decision.  It pointed out that the statement "was executed by an individual who did not state his or her position in the bank," and that Mo did not submit sufficient documentation "explaining how the individual is familiar with the situation surrounding the business loan — including his intended use for the proceeds when he obtained the business loan — or demonstrating that the bank issued the business loan knowing that [Mo] would use the proceeds in a manner contrary to the specified permissible uses."  AAO Second Decision at 2243.  The AAO also addressed the legal opinion Mo had provided and found that it conflicted with another express provision of the loan contract indicating that any modification to the contract terms must be in writing.  Id. at 2244.  The AAO then concluded that the evidence in the record, including the July 2019 statement and the legal opinion, did not show that Mo was authorized to use the loan as his EB-5 capital.  Id.

Once again, Plaintiff believes that he has proven by a preponderance of evidence that he was authorized to use the loan for EB-5 investment.  He contends that the AAO acted arbitrarily by focusing mostly on the wording of the original loan document while "dismissing any subsequent evidence that sheds light on the matter."  Pl. Resp. to Def. Cross-Mot. at 9.  But, as the Court has recounted above, the AAO gave due consideration to the additional evidence he submitted and clearly explained why it found such evidence insufficient to support his position (and that of his attorney in China) that he was authorized to use the bank loan for personal investment.  While Mo believes that the statement from the bank squarely resolves the issue, see

id. at 8, the AAO need not take his word for it.  The agency is required by law to "examine each

piece of evidence for relevance, probative value, and credibility, both individually and within the

context of the totality of the evidence," Chawathe, 25 I. & N. Dec. at 376, and the AAO did just

that here when it reviewed the July 2019 statement and cast doubt on its credibility.  The same

goes for the AAO's assessment of the legal opinion issued by Mo's Chinese attorney, which

relied on the questionable July 2019 statement and offered a conclusion unsubstantiated by the

express language of another clause of the loan contract.  Under these circumstances, the Court

cannot agree that the agency's conclusion regarding Plaintiff's ability to use the bank loan as

personal investment was arbitrary.

      C.  Source of Funds for Properties

      Finally, the AAO stated in its first opinion that "assuming *arguendo* that [Mo] may

lawfully use the loan proceeds to invest in the NCE, the record is insufficient to confirm the

lawful source of the funds he and [Zhu] used to purchase the properties that serve as collateral

for the loan."  AAO First Decision at 1991.  The AAO pointed to two deficiencies in the

evidence submitted: first, Mo never established that he and Zhu had lawfully accumulated

adequate funds to purchase the four properties, id. at 1992; and second, the record includes

inconsistent documentation relating to Zhu's employment and income.  Id. at 1992–93.  To these

two issues the Court now turns.

      *1.  Accumulation of Earnings*

      As part of his application, Mo submitted income certificates purporting to show that he

and Zhu earned enough money to purchase the properties that served as collateral for the bank

loan, the proceeds of which he remitted to the NCE as EB-5 investment capital.  Id. at 1992

(explaining evidence submitted by Mo).  The AAO, however, stressed that "[e]vidence of

earnings, without additional corroboration demonstrating [Mo and Zhu] had saved their income, is insufficient to establish that they had lawfully accumulated adequate funds to purchase the . . . properties" by 2003 when they were acquired.  Id.

In response, Mo submitted documents from the National Bureau of Statistics of China that listed information about household consumption expenditure in his city of residence, Chongqing, during the relevant period.  See Second AAO Decision at 2244.  While neither party fleshes out this point very clearly in their Motions, Mo's allegation appears to be that because the value of his and Zhu's accumulated work income minus the average household consumption expenditure exceeds the total price of the properties, he has "proved his accumulation by [a] preponderance of evidence."  Am. Compl., ¶¶ 52–53 (explaining the calculation); Pl. Resp. to Def. Cross-Mot. at 9 (suggesting that Mo and Zhu "already accumulated enough savings to sufficiently purchase the four properties that were held in collateral for the . . . loan").

The AAO, however, found that the new information on the general household consumption expenditure in Chongqing "does not account for [Mo]'s individual situation, such as the size of his household, his lifestyle, or his standard of living."  Second AAO Decision at 2244.  It thus concluded again in its second decision that Plaintiff had not shown that he and Zhu lawfully accumulated sufficient amounts from their earnings to purchase the properties.  Id.

Mo does not contest or address this conclusion in his briefs, although he did mention the issue in his Amended Complaint.  See Am. Compl., ¶¶ 52–53 (noting difficulty of obtaining old bank statements and further alleging that, even if Mo's expenditures were 20 times the average household's, he still would have accumulated enough money between 1998 and 2012 to pay for the properties).  While the Court is aware of the practical difficulty of gathering bank statements or proof of household expenditure from 20 years ago and does not doubt that Mo "tried his best

to provide whatever evidence he could find to prove that he has accumulated enough funds," id., ¶ 53, it still cannot conclude that the AAO was arbitrary and capricious in arriving at its conclusion here. The agency examined the relevant data and provided a reasonable explanation for discounting the new evidence provided by Mo — that is enough for the Court to uphold its conclusion. Nor does the Court see how Mo's calculation concerning his income accumulation through 2012, id., ¶ 52, would reveal the agency's concerns about his income as of 2003 to be arbitrary and capricious. See AAO First Decision at 1992.

### 2. *Zhu's Employment History*

This brings the Court to the last deficiency the AAO has identified in Mo's EB-5 application: inconsistent evidence relating to Zhu's employment and income. See AAO First Decision 1992–93. While Plaintiff offered documents indicating that she worked for Chongqing Jin Di Property Evaluation of the Real Estate Land Co, Ltd. between 1996 and 2013, Zhu had stated in a separate, nonimmigration-travel-visa application filed with the Department of State in 2015 that she worked for Chongqing Jin Di between 2000 and 2008 and then for Chongqing Grand Metropark Hotel Co., Ltd. between 2008 and 2013. Id.; AAO Second Decision 2245. Because Mo had claimed in the EB-5 application that Zhu's income partially financed the purchase of the four properties, the inconsistency relating to her employment history led the AAO to conclude that Plaintiff had not adequately documented the lawful source of his investment funds. See AAO First Decision at 1992–93.

Mo rejoined that the inconsistency resulted from a mistake made by the travel agency that assisted Zhu in filling out her travel-visa application. Id. at 1993. He further stated that between 2008 and 2013, she simultaneously held two jobs. Id. The AAO, however, was not persuaded by this explanation. It noted that Mo did not make any reference to Zhu's purported second job

in his initial application or explanation of source of funds; nor did Zhu's travel-visa application indicate that she was employed by two companies simultaneously.  Id.  To make matters worse, Zhu had apparently indicated in the travel-visa application that no one assisted her in filling out that very application.  Id.

In an impressive effort to clear Zhu's name, Mo submitted a total of 74 pieces of evidence to prove her employment history.  See Pl. Resp. to Def. Cross-Mot. at 9.  These include a letter from the travel agency apologizing for its staff's negligence and explaining that it is "industry practice" not to disclose the agency's involvement in helping clients fill out the applications, a partially translated foreign-language document purporting to be the original copy of Zhu's travel-visa application, business cards and letters of individuals who claimed to be Zhu's colleagues at Chongqing Grand Metropark Hotel, and an affidavit by Mo and Zhu explaining that they did not disclose Zhu's second job at the hotel because the income from that job was not part of their EB-5 investment funds.  See AAO First Decision 1993 (describing part of evidence submitted); Pl. 11 at 2171 (Statement from Travel Agency); Pl. CAR App. 11 at 2174–212 (Letters, Business Cards, and IDs of Chongqing Grand Metropark Hotel Employees); Pl. CAR App. 11 at 2214 (Affidavit of Mo and Zhu).

The AAO considered the evidence but nonetheless found it insufficient to resolve the inconsistencies in the record.  It noted that the travel agency's claim about "industry practice" was unsubstantiated, and that letters from individuals claiming to be Zhu's colleagues were not accompanied by evidence confirming and corroborating their employment history and claims. See AAO Second Decision 2245.  As for Mo and Zhu's statement that her income from the hotel did not finance the purchase of the properties that secured the bank loan, the AAO found it unpersuasive, as Mo "offered [no] documents showing that he and [Zhu] separated her purported

income from her two jobs" or that they used only her income from Chongqing Jin Di to purchase the properties. Id. at 2246.

Mo accuses the AAO of "quickly dismiss[ing] the new evidence by arbitrarily stating that [he and Zhu] did not establish why each evidence provided sufficient information to support [Zhu's] employment history." Pl. Resp. to Def. Cross-Mot. at 9. It appears to the Court, however, that the agency did its job just right. As the above summary demonstrates, the AAO explicitly considered all the evidence Mo submitted to support his claim about Zhu's employment history, evaluated its credibility and probative value, and explained why, in its view, the new evidence failed to resolve the inconsistencies by "pointing to where the truth, in fact, lies." See AAO Second Decision at 2246 (citing Matter of Ho, 19 I. & N. Dec. at 591–92). That another decisionmaker might evaluate the evidence differently and reach a different conclusion matters little, as the Court cannot disturb the agency's decision unless it finds that "no rational adjudicator would have come to the same conclusion." Visinscaia, 4 F. Supp. 3d at 133 (emphasis added).

 Because the record shows that the AAO duly considered the evidence and explained why it was lacking, its conclusion — that Mo had not reconciled the inconsistencies relating to Zhu's employment and thus had not proved the lawful source of his EB-5 investment — must prevail. See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Pension Ben. Guar. Corp., 707 F.3d 319, 325 (D.C. Cir. 2013).

## IV.    Conclusion

Because all three of the AAO's bases for denying Plaintiff's I-526 petition are not arbitrary and are supported by evidence in the record, the Court will affirm the decision of the

AAO, grant Defendants' Motion for Summary Judgment, and deny Plaintiff's.  A

contemporaneous Order so indicating will issue this day.


                                        /s/ *James E. Boasberg*
                                        JAMES E. BOASBERG
                                        Chief Judge

Date:  February 27, 2024

17